JOHN R. BROWN, Circuit Judge:
 

 This case takes us on a familiar voyage. We are confronted here with claims of the seaman status of an offshore oil field diver, improper jury instructions on inflation, insubstantial evidence and an excessive jury verdict. Holding that the plaintiff was a seaman, we affirm the damage award against the employer-diving contractor and against the drilling contractor-vessel owner. However, we reverse the judgment against the oil company for whom the diving and drilling was being performed.
 

 Jerome Wallace, a commercial diver, brought this action against his employer, Oceaneering International, Inc. (Oeeaneer-ing), a diving service contractor, for maintenance and cure and for damages under the Jones Act and the general maritime law. He brought a claim of negligence and unseaworthiness against Zapata Offshore Company (Zapata), the drilling contractor who owned the semi-submersible drilling vessel from which Wallace was working. Wallace also brought a negligence claim against Cities Service, for whom the drilling and diving work was performed and who maintained an employee on the drilling vessel to oversee the operation. Under special interrogatories a jury found for Wallace on all claims, awarded him damages of $1,581,-
 
 *430
 
 792, and assigned percentages of responsibility for his damages as follows:
 
 [1]
 

 Oceaneering 60%
 

 Zapata 35%
 

 Cities Service 5%
 

 For more than nine years, Jerome Wallace worked as a commercial diver aboard vessels in the Gulf of Mexico. Prior to his accident, he was employed by Norman Industries and performed diving work and other chores aboard three vessels to which he was permanently assigned — the PIPEL-INER I, PIPELINER VI, and PIPELINER VII. As is the plight of many workers who go down to the sea in ships, Wallace made these vessels his home for as long as a month at a time, eating and sleeping aboard the vessels.
 

 While still in the employ of Norman Industries, Wallace was contacted about possible employment with Oceaneering. Wallace indicated a preference for construction work diving as opposed to inspection diving. Wallace took this employment on the condition that he would be permanently assigned to the company’s vessel, OCEANEER I, when it returned to the Gulf of Mexico. Meanwhile, Wallace was assigned to diving operations aboard the Zapata INTREPID. Wallace was promised that if things worked out well, he could become a supervisor aboard the OCEANEER I.
 

 On September 9,1978, Wallace first went out to the INTREPID in the Gulf of Mexico. He joined a diving crew that was hired by Cities Service and assigned to the Zapata INTREPID for an indefinite time and which, as it happened, worked for five days on the INTREPID.
 

 The INTREPID crew consisted of its own Zapata drilling crew, the Oceaneering diving crew, and a representative from Cities Service who had overall supervising authority aboard the vessel. Cities Service had
 
 *431
 
 contracted with both Zapata and Oceaneer-ing to perform drilling and diving services respectively. Clarence Stroud was tool-pusher for Zapata. Kenneth Edwards was lead diver for Oceaneering and acted as supervisor of its diving crew. Although, in a sense, carrying the “big stick” aboard the INTREPID, John Quigel, Cities Service’s company man, spoke softly and did not interfere with the diving operations.
 

 
 *426
 
 (iii)
 
 Type “C” suppiied-air respirators, continuous fíow or pressure-demand class.
 
 A type “C” continuous flow or pressure-demand, supplied-air respirator shall be used to reduce the concentrations of airborne asbestos fibers in the respirator below the exposure limits prescribed in paragraph (b) of this section, when the ceiling or the 8-hour time-weighted average airborne concentrations of asbestos fibers are reasonably expected to exceed 100 times those limits.
 

 
 *431
 
 Drilling operations were completed on one well and the INTREPID was skidded to another position approximately seven and one-half feet laterally in order to begin the drilling of a well at a new position. In order accurately to space the second well from the first, a template was to be lowered to the floor of the Gulf of Mexico. The diving crew was needed to make sure that the template was properly positioned and also to assist in the removal of the template once the operation had been completed. Thus, services of the diving crew were essential to the completion of the drilling operation and to the movement of the INTREPID from one drilling spot to another. On September 11,1978, two days after coming aboard, Wallace was ordered by his supervisor, Ken Edwards, to make the deepest and most difficult dive of the entire operation. Wallace was ordered to descend approximately 155 feet to the ocean floor, and unbolt and remove the template so that drilling operations could proceed. He was instructed to stand on the template while it was being raised. As he was participating in the lifting of the template, a rusted, frayed cable used for hoisting the template broke, fell on him, and threw him to the ocean floor. Approximately 150 feet of cable recoiled striking Wallace’s head, shoulders, and back. Managing to free himself of the cable, Wallace ascended to his first decompression water stop.
 

 At his first water stop, Wallace was placed on an inadequate decompression schedule. As a result of the underwater accident and improper decompression procedures, Wallace developed serious symptoms
 
 [2]
 
 of decompression sickness at his 40 feet water stop. He was raised to the surface in a metal basket and was dazed. Proper treatment required that he be placed in a recompression chamber within five minutes so that he could avoid decompression sickness and the related physiological disorders. Unfortunately, there was at least a 12-minute delay. The delay was caused in part because Wallace’s diving supervisor entered the recompression chamber with a cigarette lighter. To avoid an explosion, the chamber had to be depressurized, the lighter brought out, and the chamber re-recompressed.
 

 Oceaneering’s policy required that diving supervisors be familiar with both the safety manual of the company and the diving manual of the United States Navy and that both be kept aboard a vessel from which diving operations took place. Neither was aboard.
 

 These mistakes were costly. As a result of this accident, Jerome Wallace’s intelligence quotient has been reduced; his motor faculties are impaired; he has developed diplopia (double vision); he sometimes has a nervous jerk; he is permanently consigned to the use of crutches; and he suffers from severe depression, which, if it continues, may result in institutionalization. His prognosis for recovery is poor.
 
 [3]
 

 Seaman Status
 

 Oceaneering argues that the District Court erred in denying its motion for directed verdict and j.n.o.v. on the question of Jones Act seaman status. The Jones Act incorporates the FELA standard, under which a directed verdict against the plaintiff is proper only when there is a complete absence of probative facts.
 
 Thezan v. Maritime Overseas Corp.,
 
 708 F.2d 175 (5th Cir.1983);
 
 Comeaux v. T.L. James & Co.,
 
 666 F.2d 294 (5th Cir.1982);
 
 Jussila v. M/T
 
 
 *432
 

 LOUISIANA BRIMSTONE,
 
 691 F.2d 217 (5th Cir.1982);
 
 Allen v. Seacoast Products, Inc.,
 
 623 F.2d 355 (5th Cir.1980);
 
 Caldwell v. Manhattan Tankers Corp.,
 
 618 F.2d 361 (5th Cir.1980). However, contrary to the contentions of Wallace, Zapata, and Cities Service, that extremely low evidentiary standard applies only to questions of liability or damages once the claim is within the Jones Act; the FELA standard is not applicable to the threshold issue of seaman status. Cases deciding the propriety of directed verdict on issues of Jones Act seaman status have not used the “complete absence of probative facts” test.
 
 Jones v. Mississippi River Grain Elevator Co.,
 
 703 F.2d 108 (5th Cir.1983);
 
 Savoie v. Otto Candies,
 
 692 F.2d 363 (5th Cir.1982) (“reasonable evidentiary basis”);
 
 Abshire v. Seacoast Products, Inc.,
 
 668 F.2d 832 (5th Cir.1982) (“any substantial evidence”);
 
 Bazile v. Bisso Marine Co.,
 
 606 F.2d 101 (5th Cir.1979) (“Boeing” reasonable men standard);
 
 Guidry v. South Louisiana Contractors, Inc.,
 
 614 F.2d 447, 454 (5th Cir.1980). Although the language in these cases varies somewhat, we conclude that a motion for a directed verdict denying Jones Act seaman status should be judged, as in
 
 Boeing,
 
 by whether there was a reasonable evidentiary basis for a jury finding that the plaintiff was a seaman.
 
 Senko
 
 v.
 
 LaCrosse Dredging Corp.,
 
 352 U.S. 370, 374, 77 S.Ct. 415, 417, 1 L.Ed.2d 404 (1957);
 
 Grimes v. Raymond Concrete Pile Co.,
 
 356 U.S. 252, 253, 78 S.Ct. 687, 688, 2 L.Ed.2d 737 (1958);
 
 Guidry v. South Louisiana Contractors,
 
 614 F.2d 447 (5th Cir.1982). Seaman status is generally a question for the jury. Only in rare cases is the question taken from the jury or trier of facts.
 
 Brunet v. Boh Brothers Construction Co.,
 
 715 F.2d 196, 198 (5th Cir.1983),
 
 citing Offshore Co. v. Robison,
 
 266 F.2d 769, 779 (5th Cir. 1959). The issue is to be left to the jury even when the claim to seaman status appears to be relatively marginal.
 
 Bouvier v. Krenz,
 
 702 F.2d 89, 90 (5 Cir.1983);
 
 Abshire v. Seacoast Products, Inc.,
 
 668 F.2d 832 (5th Cir.1982),
 
 citing Senko v. LaCrosse Dredging Corp.,
 
 352 U.S. 370, 77 S.Ct. 415, 1 L.Ed.2d 404 (1957).
 

 The substantive test for seaman status was established in
 
 Offshore Co. v. Robison,
 
 266 F.2d 769 (5th Cir.1959). In essence,
 
 Robison
 
 and later cases held that to qualify as a seaman a claimant under the Jones Act “must be permanently assigned to or perform a substantial part of his work on the vessel and the capacity of his employment must contribute to the function of the vessel, its mission, its operation, or its welfare.”
 
 Beard v. Shell Oil Co.,
 
 606 F.2d 515, 517 (5th Cir.1979).
 
 See generally,
 
 Engerrand and Bale,
 
 Seaman Status Reconsidered,
 
 24 S.Tex.L.J. 431 (1983).
 

 Because the parties stipulated that the INTREPID was a vessel in navigation, and that Wallace was aboard to aid in the mission and purpose of the vessel, the dispute concerns only whether Wallace was permanently assigned or performed a substantial part of his work on a vessel or identifiable group of vessels.
 
 Branniff v. Jackson Avenue-Gretna Ferry, Inc.,
 
 280 F.2d 523 (5th Cir.1960). We have recognized that performing a substantial part of one’s work aboard a vessel or identifiable fleet offers an alternative ground for meeting the permanency requirement.
 
 Davis v. Hill Engineering, Inc.,
 
 549 F.2d 314, 326 (5th Cir.1977);
 
 Bertrand v. International Mooring & Maritime, Inc.,
 
 700 F.2d 240, 246 (5th Cir.1983). Even so, these requirements are not applied literally,
 
 Davis v. Hill Engineering, Inc.
 
 549 F.2d 314, 327 (5th Cir.1977);
 
 Ardoin v. J. Ray McDermott,
 
 641 F.2d 277 at 281 (5th Cir.1981), and no one factual factor is determinative. Rather, the total circumstances of an individual’s employment must be weighed to determine whether he had sufficient relation to the navigation of vessels and the perils attendant thereon.
 
 Bertrand v. International Mooring & Marine, Inc.,
 
 700 F.2d 240, 247 (5th Cir.1983);
 
 Bouvier v. Krenz,
 
 702 F.2d 89 (5th Cir.1983).
 

 In this ease, Wallace, at the time he was injured, had been employed by Oceaneering for only several days. He had been working aboard the INTREPID for over 90% of that time. His diving crew was to leave the INTREPID when the necessary diving op
 
 *433
 
 erations were finished; he would not follow the INTREPID to another job. However, the duration of the diving crew’s assignment aboard the INTREPID was initially indefinite and, as it happened, lasted five days. The Oceaneering diving crew often would live aboard various vessels, which did not all belong to one company. However, Wallace had been promised when he accepted the job with Oceaneering that he would be given a permanent assignment aboard the OCEANEERING I when it arrived in the Gulf of Mexico. Thus, although Wallace’s work aboard the INTREPID was a substantial part of his actual employment with Oceaneering, it was intended to be relatively transitory. His assignment, until the arrival of the OCEANEERING I, was actually to move with the diving crew amongst the vessels of various owners on which Oceaneering procured diving jobs.
 

 A seaman’s Jones Act employer need not be the owner of the vessel or vessels of which the seaman is a member of the crew.
 
 Volyrakis v. MAT ISABELLE,
 
 668 F.2d 863 (5th Cir.1982);
 
 Barrios v. Louisiana Construction Materials, Co.,
 
 465 F.2d 1157 (5th Cir.1972);
 
 Mahramas v. American Export Isbrandtsen Lines, Inc.,
 
 475 F.2d 165 (2d Cir.1973). Nevertheless, in some cases in which the worker performed tasks on a number of vessels that were not part of any commonly-owned identifiable fleet, he was held not to have satisfied the requirement of permanency or a substantial part of his work aboard an identified group of vessels.
 
 Jones v. Mississippi River Grain Elevator Company,
 
 703 F.2d 108, 109 (5th Cir.1983);
 
 Guidry v. Continental Oil Company,
 
 640 F.2d 523 (5th Cir.1981).
 
 See also Longmire v. Sea Drilling Corp.,
 
 610 F.2d 1342 (5th Cir.1980);
 
 Dugas v. Pelican Construction Company,
 
 481 F.2d 773 (5th Cir.1973);
 
 Keener v. Transworld Drilling Company,
 
 468 F.2d 729 (5th Cir.1972). However, in order to gauge how those decisions bear on the status of a diver such as Wallace, one must look to the type of duties performed by those workers, where such duties are normally performed, and the extent to which the workers were exposed to maritime hazards.
 

 These cases do not control the seaman status issue in this case, because the principal duties performed by the workers in those cases was a type ordinarily associated with activities based on land or fixed platforms. Those workers performed work of a traditional maritime flavor only incidentally or fortuitously, and each opinion relied on the fact that the plaintiff’s primary duties were on land or fixed platforms.
 
 Guidry
 
 involved a foreman of a crew that inserted casing pipe into oil wells. This is an activity that originally was performed on land, and was transposed in some eases to both fixed and movable offshore oil rigs. The
 
 Guidry
 
 court, in holding that the permanency test was not satisfied, explained that Guidry’s work took him, on a random basis, to non-vessel fixed platforms, land rigs, and movable rigs; half of the rigs on which Guidry worked were not vessels. When an activity, such as running casing into oil wells, becomes maritime only by its location on a movable rig, it is natural to look closely at the duration of the relationship of the plaintiff to the vessels on which he worked.
 

 In
 
 Jones,
 
 the plaintiff was permanently attached to a grain elevator on land and each day boarded variously-owned barges brought to the elevator for unloading. He spent 15-20 minutes attaching mooring cables and removing the covers of each barge. Jones spent the greatest part of his time in a shack ashore while the barges were actually being unloaded. He spent an additional 20 minutes untying each barge and replacing the covers. He had no other duties on the barges, and never left the wharf with them. These duties are no more than a part of the role of a traditional, land-based worker, involving far less maritime risks than a traditional seafaring person. There was a transitory relationship between a land-based worker and many variously-owned vessels.
 

 Our decision in
 
 Bouvier v. Krenz,
 
 702 F.2d 89 (5th Cir.1983), rests on similar principles, which were made more explicit there. In denying seaman status to a shipyard “rigger” on the basis of a lack of
 
 *434
 
 permanency or substantiality, this Court began the analysis by pointing out that the defendant’s “riggers were shore-based workers who worked their shift at the shipyard and then went home; they never ate or slept on board a vessel, and they never went to sea.” 702 F.2d 90-91. Half of their working time was spent on ships of no identifiable group. The Court recited the explicit coverage by the LHWCA of “any longshoreman ... ship repairman, shipbuilder,” and the exclusion of “any member of a crew of any vessel.” 33 U.S.C. § 902(3) (1976). Thus,
 
 Bouvier
 
 concluded that the LHWCA demanded that the plaintiff’s “harbor bound” duties fall within the LHWCA, and without the Jones Act.
 

 In
 
 Bouvier
 
 we did not imply that the random ownership of the vessels was fatal to seaman status. To the contrary,
 
 Bouvier
 
 assumed
 
 “arguendo
 
 that a group of vessels may permissibly be defined as the variously owned vessels putting into [the shipyard] for repairs, or even as the group of vessels on which Bouvier worked.” 702 F.2d at 89.
 
 [4]
 

 Nor are
 
 Dugas, Longmire,
 
 and
 
 Keener
 
 controlling in this case.
 
 Dugas
 
 involved a land-based laborer, whose duties during his one week with his employer were cutting grass, repairing a bridge, and land-based office work. He had been sent out to a vessel for an isolated one-day job of unloading pipe on which he was injured. The Court merely cited the brevity of his tenure aboard the vessel in
 
 denying
 
 seaman status.
 
 Longmire
 
 and
 
 Keener
 
 involved workers whose “primary responsibilities” were oil drilling work performed aboard non-vessel fixed platforms, and whose duties aboard tender vessels moored to the platforms were only “incidental” or “irregular and fortuitous” 610 F.2d at 1344, 1346-47; 468 F.2d 729, 731.
 
 Longmire
 
 emphasized that a worker’s seaman status “should be addressed with- reference to the nature and location of his occupation taken as a whole.” 610 F.2d at 1347. Thus, the permanency or substantiality requirement was a stumbling block because the plaintiffs were essentially land-based (because fixed platforms are the legal equivalents of artifical island, 610 F.2d at 1348 n. 10), and performed duties totally unrelated to the operation or maintenance of a vessel.
 
 See also Billings v. Chevron U.S.A., Inc.,
 
 618 F.2d 1108 (5th Cir.1980) (roustabout who ate, slept and worked on fixed platform, but injured on tender). In applying the permanency and substantiality requirement in ambiguous cases, our analysis again and again has focused on (1) the degree of exposure to the hazards or perils of the sea, and (2) the maritime or terra firma nature of the worker’s duties.
 
 E.g., Mungia v. Chevron Company,
 
 675 F.2d 630, 632, 633 (5th Cir.1982) (exposure to maritime risks and performance of the maritime task of navigation).
 
 Accord, Senko v. LaCrosse Dredging Corp.,
 
 352 U.S. 370, 372-73, 77 S.Ct. 415, 416-17, 1 L.Ed.2d 404 (1957) (duties of a maritime or navigational character);
 
 Grimes v. Raymond Concrete Piling Co.,
 
 356 U.S. 252, 78 S.Ct. 687, 2 L.Ed.2d 737 (1958) (Supreme Court held without opinion that piledriver with no real attachment to any vessel but who was exposed to maritime perils while installing a radar tower at sea could be a seaman).
 

 This explication demonstrates why Judge Rubin’s declaration brought to the surface a principle that had been submerged in a large body of murky case law:
 

 The requirement of a relatively permanent tie to the vessel is meant to deny seaman’s status to those who come aboard a vessel for an isolated piece of work, not to deprive a person whose duties are truly navigational of Jones Act rights merely because he serves aboard a
 
 *435
 
 vessel for a relatively short period of time.
 

 Porche v. Gulf Mississippi Marine Corporation,
 
 390 F.Supp. 624 (E.D.La.1975). We reinforced this idea of looking at the broad characteristics of the employment by stating in
 
 Longmire
 
 that seaman status “should be addressed with reference to the nature and location of his occupation taken as a whole.” 610 F.2d at 1347. Because
 
 Long-mire’s
 
 primary responsibilities were on a fixed platform and were not particularly maritime, his injury during some isolated and fortuitous seaman-like duties aboard a tender did not make him a seaman.
 

 That principle was applied to the converse situation in
 
 Bertrand v. International Mooring & Marine,
 
 700 F.2d 240 (5th Cir.1983), which is closely on point with this case. There, workers who spent a large majority of their time on vessels, albeit randomly owned vessels, performing the undeniably maritime task of anchorhandling were killed in an auto accident while returning from a seven-day assignment aboard a vessel. We held that they were Jones Act seamen, even though they were fortuitously injured on land. More importantly, we reversed the district court’s holding that because the workers were not assigned to any commonly-owned fleet of vessels or any one vessel they were not Jones Act seamen. We explained:
 

 We have never held that a seaman is barred from coverage under the Jones Act if the employer neither owns nor controls the several vessels upon which the seaman works. Instead, we have specifically held that in the context of the single vessel, the employer need not be the owner or operator of the vessel for Jones Act liability to attach.
 
 E.g., Roberts v. Williams-McWilliams Co.,
 
 648 F.2d 255, 262 (5th Cir.1981);
 
 Guidry v. South Louisiana Contractors, Inc.,
 
 614 F.2d at 454;
 
 Barrios v. Louisiana Construction Materials Co.,
 
 465 F.2d at 1164-65. To require common ownership or control when seamen work on several vessels but not when they work on a single vessel is inconsistent with the liberal construction of the Jones Act that has characterized it from the beginning and is inconsistent with its purposes.
 
 Accord Robison,
 
 266 F.2d at 780.
 

 The group of vessels concept has been used to expand coverage under the Jones Act, not restrict it.
 

 In light of the purposes of the Jones Act, we will not allow employers to deny Jones Act coverage to seamen by arrangements with third parties regarding the vessel’s operation or by the manner in which work is assigned.
 
 See Williams v. Milwhite Sales Co.,
 
 197 F.Supp. 730 (E.D.La.1961),
 
 cited with approval in Barrios v. Louisiana Construction & Materials Co.,
 
 465 F.2d 1157 (5th Cir.1972).
 

 We conclude that in light of the group of vessels concept discussed above, reasonable persons could find that plaintiffs were seamen because they performed a substantial portion of their work on vessels.
 

 700 F.2d at 245, 247.
 

 However, in addition to holding that random ownership of the vessels on which a plaintiff worked did not preclude his meeting the permanency or substantiality aspect of seaman status,
 
 Bertrand
 
 emphasized the “character and extent” or “nature and location” of the work performed as
 
 affirmatively supporting
 
 Jones Act coverage. Explaining that “no particular factor is determinative of seaman status, but that each is indicative,”
 
 Bertrand
 
 held that
 

 we must consider all the circumstances of claimants’ employment to determine the relation of the vessel-related activities to claimants’ total responsibilities.
 
 Longmire,
 
 610 F.2d 1347 n. 6.
 

 700 F.2d at 247.
 
 Accord Bouvier v. Krenz,
 
 702 F.2d 89, 90 (5th Cir.1983). Specifically,
 
 Bertrand
 
 found persuasive that the nature of the anchorhandling crew’s work was such that they never worked except in conjunction with vessels, that the workers actually went to sea and ate and slept aboard the
 
 *436
 
 vessels, and that the mission of the ancho-rhandling crew was coextensive with the mission of the crew.
 
 [5]
 

 Based on the stipulations that the INTREPID was a vessel in navigation and Wallace contributed toward its mission, the seaman status of Wallace is established by his exposure to maritime perils with regularity and continuity, and the maritime nature of his primary duties. The testimony indicated that upwards of 90 to 99% of a diver’s working time was spent offshore. More than 95% of Wallace’s work was performed at sea. He, along with the various other crew members, ate and slept aboard the INTREPID. His assignment to this particular vessel, though temporary, was of indeterminate duration.
 

 A diver’s work
 
 necessarily
 
 involves exposure to numerous marine perils, and is inherently maritime because it cannot be done on land. It is not, like so many offshore oil field occupations, an art developed in land work and transposed to a marine setting.
 
 See, e.g., Guidry v. Continental Oil Co.,
 
 640 F.2d 523 (5th Cir.1981). Oil field divers who regularly spend days or weeks at a time working, eating, and sleeping on vessels are exposed to the same hazards as other seamen. Moreover, when a diver descends from the surface, braving the darkness, temperature, lack of oxygen, and high pressures, he embarks on a marine voyage in which his body is now the vessel. Before he can complete his assigned task, he must successfully navigate the seas.
 

 We hold that a commercial diver, who embodies the traditional and inevitably maritime task of navigation, has the legal protections of a seaman when a substantial part of his duties are performed on vessels. It is the inherently maritime nature of the tasks performed and perils faced by his profession, and not the fortuity of his tenure on the vessel from which he makes the particular dive on which he was injured, that makes Wallace a seaman.
 

 Accordingly, we hold that there was no error in denying Oceaneering’s motions for directed verdict and j.n.o.v. on the issue of seaman status.
 

 Negligence of Cities Service
 

 Cities Service appeals the trial court’s denial of its motion for directed verdict and j.n.o.v. Because reasonable men considering all the evidence in the light and with all reasonable inferences most favorable to Wallace, could not find that Cities Service was negligent,
 
 Allen v. Seacoast Products,
 
 623 F.2d 355 (5th Cir.1980);
 
 Boeing Co. v. Shipman,
 
 411 F.2d 365 (5th Cir.1969) (en banc),
 
 [6]
 
 we hold that Cities Service was entitled to a directed verdict.
 

 Cities Service, the well owner, hired Zapata as drilling contractor. Cities Service also contracted with Oceaneering to provide diving services for the drilling operation. Zapata provided its own drilling vessel, the INTREPID, the necessary drilling equipment, and its own employees to operate the vessel and the drilling equipment. Ocea-neering brought its own employees as divers. Thus, Cities Service did not own the vessel, the drilling equipment, or the cable that parted. Nor did it employ any divers, crane operators or other diving or drilling personnel.
 

 The only Cities Service employee at the drilling site was Jim Quigel. His role was that of the usual “company man” in the offshore oil patch. He monitored the progress of the work of the independent contractors, making sure that the result was what the oil company had bargained for. This would include a concern whether the well was drilled in the proper location, but not in detail how it was done. Although he could have ordered the work
 
 *437
 
 stopped if he observed an obviously dangerous situation, inspections of equipment and the choice of safe work methods were understood by all to be the responsibility of Zapata, and as to diving equipment and procedures, Oceaneering. Zapata had a toolpusher, and Oceaneering had a diving supervisor, both of whom called the shots in their respective realms. Quigel had no actual control over or responsibility for the details of the drilling and diving work, but merely inspected the progress.
 

 Neither did Quigel control the operation of the particular procedure in which Wallace was injured. He was in the vicinity of the diving station on the vessel in order to see that the second well was correctly placed. However, there was no evidence that he had been aware that a previously discarded and weak cable was used to lift the template. Nor did he know that a diver was or would be riding up on the template.
 

 This Court has consistently held on similar facts that a principal, such as Cities Service, who hires independent contractors over which he exercises no operational control has no duty to discover and remedy hazards created by its independent contractors.
 
 Moser v. Texas Trailer Corp.,
 
 623 F.2d 1006, 1014-15 (5th Cir.1980);
 
 McCormack v. Noble Drilling Corp.,
 
 608 F.2d 169, 175 (5th Cir.1979); W. Prosser, The Law of Torts § 71 (4th ed. 1971); Restatement (Second) of Torts § 409, § 414, comment at 388 (1965).
 
 [7]
 

 See also Hyde
 
 v.
 
 Chevron U.S.A., Inc.,
 
 697 F.2d 614 (5th Cir.1983);
 
 Guidry v. Continental Oil Co.,
 
 640 F.2d 523 (5th Cir.1981). The evidence reflects that Cities Service did not retain control over the manner of performance of the drilling and diving work on the INTREPID, nor over the particular operation in which Wallace was injured. Thus, Cities Service could not be liable for Wallace’s injuries resulting from the negligence of Zapata and Ocea-neering and Cities Service was entitled to a directed verdict.
 

 Because the district court found each of Oceaneering, Zapata, and Cities Service to be liable to Wallace for the full amount of his damages found by the jury, and Cities Service has now been exonerated by us, Oceaneering and Zapata remain so bound. As between themselves, Oceaneering and Zapata must bear proportionately the 5% of responsibility that the jury attributed to Cities Service. Because Oceaneering was found 60% liable and Zapata 35% liable, Oceaneering will now bear approximately 63.2% of the total damages, and Zapata will bear the other approximately 36.8%
 

 Zapata’s Indemnity Claim
 

 By a cross claim against Oceaneering (and its insurer, American Home), Zapata sought indemnity under a “master service contract” executed by Zapata and Oceaneering six months before the diving job aboard the INTREPID began. The master contract was to “control and govern all work performed by contractor [Oceaneering] for Zapata”, under subsequent verbal and/or written work orders, at all times until cancelled by either party.
 
 [8]
 

 
 *438
 
 Section 9 of the contract requires that Oceaneering indemnify Zapata from all liabilities and claims. Section 8 of the master service contract requires that Oceaneering also maintain certain liability insurance endorsed in a specific way as to make Zapata an additional assured. The master contract also provided that if Oceaneering failed to satisfy the insurance requirements, Ocea-neering would be liable as an “insurer” of Zapata.
 

 Oceaneering and American Home filed a motion for partial summary judgment seeking to dismiss the indemnity claim on the ground that the master service contract did not apply to the diving work aboard the INTPREPID, because the contract was effective only when Oceaneering was performing work for Zapata. The contract between Zapata and Cities Service for the drilling of this well specifies in Exhibit C, Part 3, that Cities Service would provide all divers and diving services required in the operation and that Cities Service would also pay for divers and their services. The Oceaneering records clearly show that Cities Service fulfilled this obligation by hiring and compensating Oceaneering for diving services.
 

 On the basis of these uncontested facts the trial court, in effect, held that work to be “performed ... for Zapata” was confined to situations in which there was a contractual relationship between Zapata and Oceaneering. We construe the contract in the same way. The generalized pretrial testimony of Kenneth Edwards (Oceaneer-ing’s diving supervisor aboard the INTREPID) that in the close operational working arrangement aboard the vessel the divers were also in a sense working for Zapata is insufficient to raise a genuine issue of material fact. Oceaneering’s work was at the request and on behalf of Cities Service, with whom Oceaneering had contracted directly. Zapata concedes that the services being rendered by Oceaneering were paid for by Cities Service pursuant to a contract between the two of them.
 

 This conclusion is further borne out by the terms of the master service contract itself, which demonstrate that the parties contemplated that the contract would not become effective until Zapata issued a verbal or written work order and Oceaneering accepted the assignment. It is uncontra-dicted that there was no work order given by Zapata in connection with the job on which Wallace was injured.
 

 This inapplicability of the master service contract also defeats Zapata’s claim for indemnity from Oceaneering based on a provision in the master service contract that made Oceaneering an “insurer” of Zapata against liability if Oceaneering failed to carry certain isurance or failed to have Zapata named as an additional assured. Likewise, Zapata was not an “insured” under Oceaneering’s policy with American Home Assurance Co.
 

 Excessive Verdicts as to Physical Injury
 

 All of the defendants argue that the jury’s verdict of $1,581,792.00 is excessive. They argue that a verdict “in the neighborhood of” $800,000 to $850,000 would adequately compensate the plaintiff.
 

 The plaintiff’s proof consisted of the testimonies of numerous physicians who had seen the plaintiff.
 
 [9]
 
 Cumulatively their testimony revealed that Wallace would need medical attention for the remainder of his life.
 

 The diving physiologist testified that Wallace will need medical supervision and medication for the balance of his days and that he would require constant attention in an institution. Wallace would need physical therapy and general training at a rehabilitation hospital for an indefinite period of time and estimated the cost to be $8,000 per month. The psychiatrist recommended psychotherapy once á week for an initial period of two years at a cost of
 
 *439
 
 $3,200 per year. If Wallace’s condition worsened and he would have to be institutionalized for severe depression, she estimated the cost of institutionalization to be between $125 and $150 per day. Wallace’s life expectancy was 28 years. There was testimony from other doctors regarding many of Wallace’s illnesses and, in the main, each testified that Wallace would need substantial medical treatment at substantial cost. We conclude that the jury’s award is based on sufficient medical testimony. Thus, the award has an adequate evidentiary basis. We decline to disturb it.
 
 Tucker v. Bethlehem Steel Corp.,
 
 445 F.2d 390, 392 (5th Cir.1971). The verdict is not contrary to reason. “When the jury as primary fact-finder awards a certain measure of damages and the court refuses to upset that finding, we are not at liberty to reverse those decisions absent a definite finding of error.”
 
 Pellegrin v. J. Ray McDermott,
 
 504 F.2d 884, 885 (5th Cir.1974);
 
 See especially, Gorsalitz v. Olin Mathieson Chemical Corp.,
 
 429 F.2d 1033, 1045 (5th Cir.1970)
 
 modified,
 
 456 F.2d 180 (5th Cir.)
 
 cert. denied
 
 407 U.S. 921, 92 S.Ct. 2463, 32 L.Ed.2d 807 (1972);
 
 Crador v. Louisiana Dept. of Highways,
 
 625 F.2d 1227, at 1230 (1980);
 
 Menard v. Penrod Drilling Co.,
 
 538 F.2d 1084, 1089 (5th Cir. 1976); We find no error.
 

 The Effect of Inflation
 

 Each defendant argues that the District Court erred in allowing the jury to consider the effect of future inflation on Wallace’s future losses. One objection was based wholly on
 
 Johnson v. Penrod Drilling Co.,
 
 510 F.2d 234 (5th Cir.1975)
 
 cert. denied,
 
 423 U.S. 839, 96 S.Ct. 68, 46 L.Ed.2d 58 (1975), which we have expressly overruled in both
 
 Culver v. Slater Boat Co.,
 
 688 F.2d 280 (5th Cir.1982)
 
 (Culver I),
 
 and
 
 Culver II,
 
 722 F.2d 114 (5th Cir.1983) (en banc). Another objection, presumably based on
 
 Norfolk and Western Railway Co. v. Liepelt,
 
 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), was a generalized, non-specific objection that the submission was not a correct expression of the law as it stands now. In
 
 Culver I,
 
 we held that a jury must be allowed to consider evidence of the effect of inflation. The plaintiff offered evidence consistent with the principles of
 
 Culver I
 
 including factual and expert testimony finding a probability of an 8% per year inflation rate based on an average inflation rate for the previous ten years.
 
 Culver II,
 
 although overruling in part
 
 Culver I,
 
 nevertheless held that its ruling would not apply to jury verdicts instructed on the basis of principles set forth in
 
 Culver I.
 
 We find no error.
 

 AFFIRMED IN PART AND REVERSED IN PART.
 

 [1]
 

 . The interrogatories are paraphrased as follows:
 

 1. Was the plaintiff a seaman and member of the crew of the Zapata “Intrepid”?
 

 Answer Yes or No Yes
 

 2. Was the vessel, Zapata “Intrepid” unsea-worthy in the manner claimed by the plaintiff and was such unseaworthiness a legal cause of damage to the plaintiff?
 

 Answer Yes or No Yes
 

 3a. Was Oceaneering negligent in the manner claimed by plaintiff and was such negligence was a legal cause of damage to plaintiff?
 

 Answer Yes or No Yes
 

 3b. Was Zapata negligent in the manner claimed by plaintiff and was such negligence was a legal cause of damage to plaintiff?
 

 Answer Yes or No Yes
 

 3c. Was Cities Service negligent in the manner claimed by plaintiff and was such negligence a legal cause of damage to plaintiff?
 

 Answer Yes or No Yes
 

 4. If you answered “Yes” to Question 2 or 3a, 3b, 3c, do you find that the plaintiff himself was negligent and that such negligence was a legal cause of plaintiffs own damage?
 

 Answer Yes or No No
 

 5. If you answered “Yes” to Question 4, what proportion or percentage of plaintiffs damage do you find from a preponderance of the evidence was caused by his own negligence?
 

 Answer 0 per cent.
 

 6. If you answered “Yes” to Question 2 or 3a, 3b, 3c, what proportion or percentage of plaintiffs damage [was] legally caused by the negligence of the respective parties or the unseaworthiness of the Zapata vessel?
 

 Answer in Terms of Percentages:
 

 Oceaneering International, Inc. 60 %
 

 Zapata Offshore Company 35 %
 

 Cities Service Company __5_%
 

 7. If you answered “Yes” to Question 2 or 3, what sum of money [was] the total amount of plaintiffs damages?
 

 Answer in Dollars $1.581.792,00
 

 8. If your answer to Question 1 is “No”, do not answer the following questions.
 

 9. Has the plaintiff, Jerome D. Wallace, reached maximum medical cure?
 

 Answer Yes or No Yes
 

 10. What amount is owed to plaintiff for maintenance and cure through October 28, 1980?
 

 Answer $21.260.00
 

 11. Was Oceaneering arbitrary or unreasonable in failing to pay proper maintenance and cure set forth in your response to Question 10?
 

 Answer Yes or No Yes
 

 12. What is the amount of damages resulting from the arbitrary or unreasonable conduct of Oceaneering in failing to pay maintenance and cure set forth in your answer to Question 10?
 

 Answer $13.000.00
 

 [2]
 

 . The symptoms were dizziness, weakness, nausea, numbness and visual difficulty.
 

 [3]
 

 . Wallace’s functional impairments included impairment of smell, taste, vision, eye accomo-dation, eye convergence, bodily sensation, and muscle strength.
 

 [4]
 

 . In a case twenty years older than
 
 Bouvier,
 
 involving a land-based welder who made repairs on boats — most often in a repair yard, but occasionally when the hull was partially lifted from the water — seaman status was also nied.
 
 Rotolo v. Halliburton Company,
 
 317 F.2d 9 (5th Cir.1963). However, in
 
 Rotolo
 
 the Court emphasized the lack of a relation to a particular vessel or vessels, and affirmed the district court’s holding that the LHWCA applied. Again, because the worker was totally land-based, performed welding repairs while the ship was out of operation and was not exposed to any peculiarly maritime risks, the permanency requirement was used to deny seaman status.
 

 [5]
 

 .
 
 Bertrand
 
 specifically pointed out that a marine worker’s task need not be coextensive with the vessel’s larger mission in order for him to be seaman. 700 F.2d at 248, n. 16.
 

 [6]
 

 . Although the evidence in the Jones Act claim is evaluated by a lower standard (“complete absence of probative facts”),
 
 Id.,
 
 the claim against Cities Service, a third-person, is one for maritime tort under the general maritime law, and not under the Jones Act. Hence, the
 
 Boeing
 
 standard is applicable.
 

 [7]
 

 . The Restatement provides that an employer who retains control of the work has a duty to prevent independent contractors from working in a dangerous manner. Comment C provides:
 

 In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to the employer, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.
 

 [8]
 

 . The master service contract provides:
 

 Zapata [is not obligated] to order work and/or equipment or materials from contractor, nor does it obligate contractor to accept such order, but it, together with any applicable work order shall control and govern all work accepted by contractor and shall define the rights and obligations of Zapata and contractor during the term hereof.
 

 [9]
 

 . The jury heard testimony from physicians from varied disciplines, including a psychiatrist, a neuropsychologist, a neurotologist, an ophthalmologist, a clinical psychologist, a neurosurgeon, a diving physiologist, and a psychologist specializing in vocational rehabilitation.