Richard **VIATOR**

v.

**GORDON'S TRUCKING COMPANY, et al.**

Civ. A. No. 93–0895.

United States District Court,
W.D. Louisiana,
Lafayette Division.

Feb. 8, 1995.

Allan L. Durand, Perrin, Landry, deLaunay & Durand, Lafayette, LA, for plaintiff Richard Viator.

James T. Guglielmo, Guglielmo, Lopez, Tuttle, Hunter & Jarrell, Opelousas, LA, for defendant Gordon's Trucking Co.

Paul B. David, Broussard, David & Daigle, Lafayette, LA, for defendant Anglo American Ins. Co.

Marc D. Moroux, Briney & Foret, Lafayette, LA, for defendant and third party defendant Sea Shell, Inc.

## OPINION

NAUMAN S. SCOTT, District Judge.

In this maritime tort action plaintiff, Richard Viator, seeks damages for personal inju-

ries he sustained while piloting a barge on Bayou Teche between St. Martinville and New Iberia, Louisiana. Viator was injured when an excavator operator, who was operating an excavator from the bow of the barge, accidentally struck the plaintiff with tree limbs that protruded from the excavator's claws. Viator alleges that his injuries were caused by the negligence of his employer, Gordon's Trucking Company (Gordon's), and/or by the unseaworthiness of his employer's barge, the MINDY II. In accordance with these claims, he seeks damages under 46 U.S.C.App. § 688, the Jones Act, and under the general maritime law.

Sea Shell, Inc. (Sea Shell) provided the excavator and its operator to Gordon's under a service contract. Prior to trial, plaintiff settled his claims against Sea Shell.[1]

Several issues were contested at trial. First, Gordon's disputed whether Viator qualifies as a seaman under the Jones Act. All of the parties contested the question of which party or parties is/are responsible for plaintiff's injuries. Also, Sea Shell disputed whether Gordon's can maintain an indemnity claim based on breach of an implied warranty of workmanlike service. Finally, Gordon's and Sea Shell disputed whether the excavator operator became Gordon's "borrowed servant."

Having considered the record as a whole as well as the relevant law, we find that the plaintiff, Viator, qualifies as a Jones Act seaman. We also find that Sea Shell's negligence was the sole cause of plaintiff's injuries. Finally, we find that the excavator operator remained an employee of Sea Shell's both in name and function so that the operator did not become Gordon's "borrowed servant." Because we find that Sea Shell is solely responsible for the plaintiff's injuries and because we take judicial notice of the plaintiff's settlement with Sea Shell, the indemnity claim, as well as the issue of damages, is moot.

Below the court issues its findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a). To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as conclusions of law. To the extent that any of the conclusions of law are findings of fact, they are adopted as findings of fact.

## FINDINGS OF FACT

1. Gordon's hired plaintiff, Viator, sometime in September of 1992.

2. Gordon's was working under various contracts requiring Gordon's to clean up debris left in the wake of Hurricane Andrew. One of these contracts required Gordon's to remove debris from Bayou Teche near New Iberia and adjacent areas. Viator was working under this contract when the accident occurred.

3. Prior to the accident, Gordon's had not performed similar operations; primarily, Gordon's business involved hauling oil field equipment.

4. Gordon Doerle, the owner and manager of Gordon's, visited the clean up sites several times each day.

5. In furtherance of the Bayou Teche operation, Gordon's bareboat chartered the 60' x 30' spud barge MINDY II from Doerle's Quarterboats, Inc. and equipped it with a Shugart push unit. This push unit was fitted to the stern of the barge to provide propulsion. It resembles a common outboard motor, except that it is considerably larger and is equipped with an elevated console from which the operator maneuvers the vessel. The position of the console requires the operator to stand approximately three and a half feet above the deck and about four feet forward of the stern as he operates the controls. The space where the operator must stand is very limited and there is no overhead protection.

---

1. While Sea Shell settled plaintiff's claim against it prior to trial, Sea Shell's attorney appeared for the purpose of defending against Gordon's claim for breach of implied warranty of workmanlike service.

In addition, prior to trial we granted Anglo American Insurance Company's Motion for Summary Judgment. In our Ruling dated November 8, 1994, we held that the policy of excess maritime employer's liability insurance issued by Anglo American does not provide coverage to defendant, Gordon's Trucking Company.

6. From approximately just prior to Christmas of 1992, until his accident on February 1, 1993, Viator was solely responsible for piloting the MINDY II. Besides navigating to the particular work sites along the bayou, Viator also used the push unit to hold the bow of the barge against the bank of the bayou so that the current did not disturb the excavator as he picked up debris.

7. Prior to his assignment as the pilot of the MINDY II, Viator operated a crane-truck for Gordon's.

8. Viator and the excavator operator were the only two persons who continuously worked aboard the MINDY II.

9. Sea Shell provided both the excavator and its operator pursuant to a contract between Gordon's and Sea Shell. The excavator, which rides on tracks, was situated on the bow of the barge. In the normal course of loading, the excavator operator would first pick up several tree limbs with the excavator's grapple. The operator would then raise the boom or crane so that the excavator would be stable enough to allow the operator to rotate the load around to the deck of the barge. With the boom raised and the excavator stable, the operator would rotate the excavator and with it the boom and grapple so that the load was over the barge between the excavator and the push unit. Finally, the operator would lower the limbs onto the barge deck. Often, stacking a full load required the operator to extend the boom and grapple towards the push unit before lowering the load.

10. When the barge became full, the limbs and debris would be unloaded from the MINDY II onto a larger barge that was located nearby.

11. On the day of the accident, Clint Thibodeaux was the excavator. February 1, 1992 was Thibodeaux's first day working this job; prior to February 1, a different Sea Shell operator worked the excavator.

12. On the day of the accident, both Viator and Thibodeaux had C.B. radios which functioned properly.

13. Thibodeaux admitted that his view of the drop area was substantially impaired by the grapple, which was full of limbs, the pile of limbs previously dropped on the deck of the barge, and the boom.

14. Both of the experts and Thibodeaux, Sea Shell's operator of Sea Shell's movable crane, agreed that it is an absolutely forbidden practice for a crane operator, whose vision of the drop area is impaired as described in paragraph thirteen above, to release a load in that area unless a helper with an unobstructed view of the drop area previously communicated to him that the drop was safe.

15. Neither Thibodeaux, Sea Shell's operator on the date of the accident, nor Sea Shell's operator previous to the date of the accident, nor any other officer or employee of Sea Shell made any effort to satisfy this fundamental rule of safe operation. No watcher was furnished or requested. Viator was stationed at the opposite end of the barge and obviously had an unobstructed view; he also had radio communication with Thibodeaux. When Thibodeaux's view was impaired, he could easily have required clearance from Viator before lowering a load of trees in the drop area not clearly visible to him. He simply ignored a fundamental safety practice of which all were well aware.

16. Sometime between 11:00 a.m. and 12:00 p.m. on February 1, 1992, Thibodeaux picked up several limbs in the excavator's grapple. These limbs had several smaller limbs and branches protruding through the claws of the grapple and all along the larger limbs. In the usual manner, Thibodeaux raised the boom and rotated the excavator, boom and grapple. Because most of the loading area between the excavator and the push unit was full, Thibodeaux extended the boom to allow him to lower the load near the push unit.

17. With his vision impaired, Thibodeaux negligently lowered the load, striking Viator who sustained injuries. Viator was not warned, was not aware of the load, and had little time to react.

18. Viator went back to work on land for Gordon's for a short period of time following the accident.

## CONCLUSIONS OF LAW

### I. Seaman Status

To attain seaman status, a claimant must show that he was either permanently assigned to or performed a substantial part of his work aboard a vessel or identifiable group of vessels. *Offshore Co. v. Robison*, 266 F.2d 769 (5th Cir.1959). Gordon's argues that because Viator spent only a short period out of his entire employment time with Gordon's working on the MINDY II, he does not meet the test for seaman status and therefore cannot sue under the Jones Act. We disagree. While we recognize that Viator spent only approximately one-fourth to one-fifth of his time piloting the spud barge, we give great weight to the fact that during this period he alone was responsible for the navigation and operation of the barge. Because we find that Viator spent a substantial amount of time performing traditional seaman's duties, work that normally would be performed by a member of a crew, we find that Viator qualifies as a seaman under the Jones Act.

Gordon's argues that the Fifth Circuit's decision of *Barrett v. Chevron U.S.A., Inc.* requires us to deny Viator Jones Act coverage because he did not perform a substantial portion of his entire employment duties aboard a vessel. 781 F.2d 1067, 1075 (5th Cir.1986). We disagree for two reasons. First, the facts relating to seaman status in this case differ from those addressed in *Barrett*. Second, our finding of Jones Act coverage is consistent with the law as set forth in *Barrett* and in other Fifth Circuit jurisprudence.

In *Barrett*, the Fifth Circuit addressed whether a welder's helper who spent as much as twenty to thirty percent of his time aboard several vessels was a seaman. As a welder's helper, Jethro Barrett, was assigned to provide maintenance and repair work to fixed offshore platforms in the Gulf of Mexico. The nature of this work often demanded that Barrett spend time aboard various support vessels. For the eight day period immedi-

ately preceding his injury, Barrett was assigned to work from the D/B FALCON renovating a caisson.[2] During this period, he spent as much as seventy percent of his time working aboard the FALCON. Barrett was injured and sued his employer alleging seaman status under the Jones Act. *Id.* at 1068–1069.

In a ground breaking decision, the Fifth Circuit held that if an employee's duties require him to divide his time between working aboard a vessel and on land, his status as a crew member is determined in the context of his entire employment with his current employer. Accordingly, the court held that because Barrett did not perform a substantial amount of his work aboard a vessel or fleet of vessels, he was not a member of the crew of a vessel and therefore not a seaman. *Id.* at 1075–1076.

While *Barrett* is certainly relevant to this case in that we kept its lessons in mind when reaching our conclusions, the facts of this case are sufficiently dissimilar so that *Barrett* does not compel a similar conclusion here. *Barrett* involved a welder's helper who performed no duties which were essential to the navigation of the vessels on which he only sometimes worked. It appears to us that Barrett's vessel related activities were entirely incidental to his welding related work which, but for the location of the fixed platforms in the Gulf, was indistinguishable from many land based welding jobs. Also, it appears that the time Barrett spent on different vessels was sporadic. *See* pp. 1068–1069.

Viator, on the contrary, piloted the MINDY II for approximately one month without interruption. He did not merely contribute to the navigation of the vessel, he was solely responsible for it. He was the entire crew. As the pilot, he performed the one task which is absolutely essential to any maritime transportation. His duties required him to safely navigate the sixty foot barge to whichever area in the bayou that required clean up. Once in position, he sometimes had to use the controls and propulsion of the vessel to hold its bow into the bank against the

---

**2.** "The caisson was a small fixed structure, measuring only ten by fifteen feet, comprised basically of one production well which was tied into the underwater pipeline system in the field." *Id.* at 1069.

current. Because Viator single handedly performed a traditional and essential seaman's duty for significant period of time, *Barrett* does not tie our hands.

A close reading of *Barrett* in concert with other relevant seaman status jurisprudence demonstrates a sufficient latitude for our holding. The *Barrett* court sought guidance from *Longmire v. Sea Drilling Corp.*, a case on which we now rely. 610 F.2d 1342 (5th Cir.1980). In *Longmire*, the Fifth Circuit pointed out that an informal change in a claimant's duties requiring him to perform the traditional duties of a crew member for a regular period of time may change the claimant's status to that of a "seaman." *Id.* at 1347, n. 6. We also rely on *Wallace v. Oceaneering International*, which highlights the importance of considering the navigational character of the claimant's work in making this determination. 727 F.2d 427 (5th Cir. 1984). Keeping in mind that the Fifth Circuit seeks to protect the seaman classification against elusiveness and arbitrariness,[3] we now more carefully consider Viator's case in light of *Longmire*, *Barrett*, and *Wallace*.

In *Longmire*, the court considered whether a roughneck who spent one of three seven-day hitches working on a vessel was a seaman. 610 F.2d 1342. Ronnie Longmire's principal duties involved general maintenance of the drilling platform and preparation of the pipe for drilling. On his third hitch, however, Longmire was injured while stowing anchor chains aboard a tender. *Id.* at 1344–1345. Factually, *Longmire* is similar to *Barrett* in that the *Longmire* court found that Longmire's primary duties related to drilling activities on a fixed platform. Like Barrett's, Longmire's vessel related activities were merely incidental to his principal job duties.[4] *Id.* at 1347. Finding that Longmire did not perform "a significant part of his work aboard the ship with ... some degree of regularity and continuity," the court held that he was not a seaman. *Id.*

Despite its holding, the *Longmire* court suggested that, in some circumstances, the seaman status analysis involves an evaluation of a claimant's primary responsibilities together with the degree of regularity and continuity in which he performs those responsibilities. *Id.* at 1347, n. 6. The court stated that the question of whether a person performed a substantial part of his work on a vessel "comprehends more than a mere quantitative assessment of where the claimant spent the greater part of his working day." *Id.* at 1346. The question also requires the court to ask: what was the claimant doing for the greater part of the day? *See Id.*

The *Barrett* court found *Longmire*'s footnote six especially instructive and included the majority of the note in the main text of its opinion. *Barrett v. Chevron, U.S.A., Inc.*, 781 F.2d 1067, 1075 (5th Cir.1986). We also rely heavily on footnote six and, accordingly, we include the majority of it here:

> When seaman status is sought on the theory that the claimant has performed a substantial part of his work on the vessel, however, the circumstances of the claimant's injury cannot be viewed in isolation but must be considered in relation to his other regular duties. *We do not preclude the possibility that an informal and temporary change of duties, though not tantamount to permanent assignment to a vessel, may be sufficient to effect an immediate change in the worker's status to that of a seaman if the change of duties involves work that would normally be done by a member of the ship's crew and it can be reasonably said that, taking into consideration all the circumstances of his employment, the change involves a regular and continuous, rather than intermittent, commitment of the worker's labor to the "function of the vessel, its mission, its operation, its welfare."* Cf. *Beard v. Shell Oil Co.*, 606 F.2d 515 at 517 (5th Cir.1979). What is to be avoided is engrafting upon the statutory classification of a "seaman" a

---

**3.** *See Longmire v. Sea Drilling Corp*, 610 F.2d 1342, 1347 at n. 6, last sentence (5th Cir.1980).

**4.** The court found that Longmire's assignment to vessel related tasks "was irregular and fortui-

tous, entirely dependent upon and subsidiary to the progress of the drilling operation." *Id.* at 1367.

judicial gloss so protean, elusive, or arbitrary as to permit a worker to walk into and out of coverage in the course of his regular duties. (Emphasis added).

*Longmire v. Sea drilling Corp.,* 610 F.2d 1342, 1347, n. 6 (5th Cir.1980). The *Barrett* court seemed to embrace the principal outlined in note six, but the court's own spin on this principal confuses us.

The *Barrett* court wrote that when a claimant's duties are "permanently" changed he is entitled to have the assessment of the substantiality of his vessel-related work made on the basis of his activities in his new job. *Barrett,* 781 F.2d at 1075–1076. While this principal seems simple enough, applying the word "permanent" to specific cases confounds us. We can imagine cases where a claimant is assigned to what, at the time of the assignment, appears to be a permanent job but later turns out to be only temporary. We can also imagine the converse: a job that at the outset appears to be temporary but lasts for considerable time. Considering this latter hypothetical, a person who is injured at the outset of such a job might be treated differently from his successor employee who is injured after several years of work. In our confusion, we looked to *Webster's* for help. We found "permanent": continuing or enduring without fundamental or marked change: stable: lasting.[5] To this we ask: lasting how long? We are left to conclude that "permanent" is a word that is only truly applicable in hindsight.

We find the language used in *Longmire* more helpful. In *Longmire* the court pondered the "possibility that an informal and temporary change of duties, though not tantamount to permanent assignment to a vessel, may be sufficient to effect an immediate change in the worker's status." 610 F.2d at 1347, n. 6. The crucial aspects of employment that contribute to this change, the court wrote, are that the work must be the type

normally done by a member of a crew and involve a regular and continuous, rather than intermittent commitment of the worker's labor to the navigation of the vessel. *Id.*

We find that Viator's assignment to the MINDY II is an example of the seaman status "possibilities" which the *Longmire* court considered. In this case we are, in fact, confronted with a change of duties involving regular and continuous [6] work that would normally be done by a member of a ship's crew. Viator's duties changed from driving a crane-truck to piloting a barge.

We now consider Viator's case in light of *Wallace. Wallace v. Oceaneering International,* 727 F.2d 427 (5th Cir.1984). In *Wallace,* the Fifth Circuit considered whether Jerome Wallace, an offshore oil field diver, was a seaman. Wallace originally worked for Norman Industries and was permanently assigned to three vessels. However, he was lured into a new job with Oceaneering International by the promise that he would be permanently assigned to the company's, OCEANEER I, when it returned to port. In the interim, Wallace, along with other Oceaneer divers, was indefinitely assigned to work aboard the Zapata INTREPID; as it happened, however, the diving crew only worked five days on the INTREPID. *Id.* at 430. On his second day aboard the INTREPID, Wallace was injured while working on drilling equipment at a depth of 155 feet. *Id.* at 431. Faced with these difficult facts, the court had to decide whether Wallace performed a substantial part of his work on or was permanently assigned to a vessel or fleet. *Id.* at 432.

The *Wallace* court held that Wallace, who had spent only two days aboard the INTREPID, was a seaman because he was "expos[ed] to maritime perils with regularity and continuity," and because of "the maritime nature of his primary duties." *Id.* at 436. The court rejected cases considering

5. *Webster's Ninth New Collegiate Dictionary* 876 (1991).

6. By "regular" we mean that Viator piloted the barge day in and day out; he was not taken off this job to perform another. By "continuous" we mean that Viator piloted the barge each day for a substantial period of time. While one

month out of four or five may seem insubstantial, we believe the analysis of responsibilities and duration of responsibilities should be considered together and not separately. However, because Viator was solely responsible for the navigation of the barge, we focus less strictly on the duration part of the equation.

the status of platform workers who spend time on vessels and underscored the importance of considering the maritime and navigational character of a claimant's duties. *Id.* at 433. In addition, the court considered how the concept of a "permanent connection to a vessel" should be construed and quoted language from Judge Rubin's decision of *Porche v. Gulf Mississippi Marine Corp.,* 390 F.Supp. 624 (E.D.La.1975). *Wallace,* 727 F.2d at 434–435. Judge Rubin wrote that "[t]he requirement of a relatively permanent tie to the vessel is meant to deny seaman status to those that come aboard a vessel for an isolated piece of work, not to deprive a person whose duties are truly navigational of Jones Act rights merely because he serves aboard a vessel for a relatively short period of time." *Id.* (quoting *Porche,* 390 F.Supp. at 631).

*Wallace* provides strong support for our finding that Viator is a seaman. Viator's duties were truly navigational. While his term aboard the MINDY II lasted only a month, the truly navigational character of his duties persuades us that he deserves Jones Act coverage.

In concluding our analysis of seaman status, we emphasize that the analysis requires us to consider all of the circumstances of Viator's employment. After considering all of these circumstances in light of *Barrett, Longmire* and *Wallace,* we find that Viator qualifies as a seaman.

## II. Negligence

■ We find that Sea Shell's negligence was the sole cause of Viator's injuries. Specifically, we hold that Thibodeaux's failure to contact Viator to see if Thibodeaux could safely lower his load caused this accident. Thibodeaux's job was to load the debris safely. Viator's job, on the other hand, involved not only assisting in the loading process but also controlling the vessel by operating the push unit. The testimony established that Thibodeaux and Viator had working radio communication with each other. Obviously, the most important purpose of providing

these devices was so that accidents would be averted through proper communications.[7]

We find that Sea Shell in general and Thibodeaux in particular were responsible for the safe operation of the excavator. An operator must possess the knowledge required to safely carry out excavating operations. This obligation requires not only that the excavator be proficient with the levers inside the cab but also that he knows how to safely lower his load. At the very least, Thibodeaux should not have lowered his load without first communicating with Viator. The failure to do so amounts to operational negligence. *See Usner v. Luckenbach Overseas Corp.,* 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971).

## III. Unseaworthiness

■ Viator also alleges that the MINDY II was unseaworthy. A vessel owner has a non-delegable duty to provide a vessel that is reasonably fit for its intended use. *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960). Gordon's undertook this duty when it bareboat chartered the MINDY II. *See Guzman v. Pichirilo,* 369 U.S. 698, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1962); *Baker v. Raymond Intern., Inc.,* 656 F.2d 173 (5th Cir.1981). We find that Gordon's did not breach its duty because the MINDY II was reasonably fit for its intended use, cleaning up debris. This finding is consistent with our finding that Thibodeaux's failure to communicate with Viator was the cause of the accident. Had Thibodeaux used his C.B. radio to contact Viator before dropping his load, the accident would have been averted. This isolated act of negligence does not render the MINDY II unseaworthy. *Usner,* 400 U.S. at 500, 91 S.Ct. at 518.

## IV. The Borrowed Servant Doctrine

■ Finally, Sea Shell argues that since Thibodeaux was working on a Gordon's work site, aboard a barge chartered by Gordon's, and under the supervision of Gordon Doerle, Thibodeaux became Gordon's "borrowed

---

7. We are satisfied that both Thibodeaux's and Viator's radios worked properly at the time of the accident.

servant." Of course, the consequence of Sea Shell's characterization is that Gordon's should bear any responsibility for Thibodeaux's negligence. We disagree. We find that Gordon's did not exert sufficient control over Thibodeaux to justify a shifting of responsibility.

 Under the borrowed servant doctrine, the responsibility for an employee's injury is placed on the employee's actual employer rather than on his nominal employer. In *Ruiz v. Shell Oil Co.*, the Fifth Circuit spelled out the criteria for the borrowed servant analysis. 413 F.2d 310 (5th Cir. 1969). While stating that "control" over the employee is the centerpiece of the analysis, the court also provided several factors which assist in weighing the degree of control that an employer demonstrates. These factors include:

1) who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?

2) Whose work is being performed?

3) Was there an agreement, understanding or meeting of the minds between the original and the borrowing employer?

4) Did the employee acquiesce in the new work situation?

5) Did the original employer terminate his relationship with the employee?

6) Who furnished the tools and the place for performance?

7) Was the new employment over a considerable length of time?

8) Who had the right to discharge the employee?

9) Who had the obligation to pay the employee?

*Id.* at 312–313. When weighing these factors, we keep in mind that no one factor, or combination of them, is conclusive. The analysis must be custom fit to each case. *Id.* at 312; *Gaudet v. Exxon Corp.*, 562 F.2d 351, 356 (5th Cir.1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978).

We now apply the *Ruiz* factors to the present case. We find that Sea Shell and specifically its owner, Lynn Romero, retained control of Thibodeaux. This was Thibodeaux's first day at the Gordon's work site. The testimony established that while Gordon Doerle instructed Thibodeaux on which branches to pick up, Doerle did not give Thibodeaux any instructions as to how to operate the excavator. Thibodeaux's compliance with Doerle's instructions amounts to nothing more than cooperation, not subordination. Furthermore, the testimony shows that Romero visited the job site for 35–40 minutes on that morning prior to the accident. Thibodeaux testified that he would have followed any instructions Romero gave him. On the question of whose work was being performed, we find that Gordon's was; but we give little weight to this finding since a contractor necessarily performs another company's work.

We also find that there was no meeting of the minds between the parties regarding who had control of Thibodeaux. Because we find that there was no agreement and because we find that Romero retained supervisory authority, the question of whether Thibodeaux acquiesced in this situation provides us little insight. Considering factor five, whether the original employer terminated his relationship, we again point out that Romero even visited the job site. Furthermore, Thibodeaux returned to Sea Shell the next day for a new assignment.

The testimony also shows that Sea Shell furnished the excavator and the operator of the excavator for the operation. In addition, Thibodeaux spent only one day on this job. On the question of who had the right to fire Thibodeaux, the most accurate answer is both Doerle and Romero. As Thibodeaux stated, Doerle "could run [him] off the job," but Romero had the continued authority to terminate his employment with Sea Shell. Finally, we look at who was under the obligation to pay Thibodeaux. Thibodeaux stated that he did not expect to be paid by Gordon's. However, there was testimony that Doerle offered bonuses to a group of employees if the group met a deadline. While Thibodeaux was a member of this group, we find that Sea Shell was responsible for Thibodeaux's wages.

378

Taken together, these factors demonstrate that Sea Shell retained control of Thibodeaux. Accordingly, we find that the borrowed servant doctrine is inapplicable.

## CONCLUSION

In sum we hereby find that:

a) Richard Viator meets the test for seaman status,

b) Sea Shell's, and specifically Clint Thibodeaux's, negligence was the sole cause of Viator's injuries,

c) The MINDY II was a seaworthy vessel, and

d) Sea Shell retained control over Thibodeaux so that the borrowed servant doctrine is inapplicable. We reiterate that because we find that Sea Shell is solely responsible for Viator's injuries and because we take judicial notice of Sea Shell's settlement with Viator, we need not address the issues of damages and indemnity.

DONE AND SIGNED.