Alexander FISHER, Plaintiff–Appellee–Cross–Appellant,

v.

Stephen R. NICHOLS, Defendant–Appellant–Cross–Appellee,

and

Windship Trident Shipworks, Inc.; Blaine Wise; Clive Youlten, Defendants.

Nos. 141, 258, Dockets 94–7696, 94–7728.

United States Court of Appeals, Second Circuit.

Argued Dec. 13, 1995.

Decided April 11, 1996.

Thomas H. Healey, New York City (Mark Healey, New York City, of counsel) for Defendant–Appellant–Cross–Appellee.

Robert I. Reardon, Jr., The Reardon Law Firm, P.C., New London, CT, for Plaintiff–Appellee–Cross–Appellant.

Before LUMBARD, WINTER, and WALKER, Circuit Judges.

WALKER, Circuit Judge.

Defendant Stephen R. Nichols appeals from a judgment of the United States District Court for the Southern District of New York (Mark D. Fox, *Magistrate Judge*), following a jury verdict for Plaintiff Alexander Fisher. In August 1987, Fisher was injured during a sailing race while serving as a crewmember aboard the OBSESSION, a seventy foot oceangoing sailboat owned by Nichols. Fisher was struck by the boom sheet during a jibe and suffered spinal injuries to his back and neck. Fisher sued Nichols under § 33 of the Merchant Marine Act of 1920, 46 U.S.C.App. § 688 (the "Jones Act"), and under the unseaworthiness doctrine of general maritime law. The parties consented to a jury trial before a magistrate judge pursuant to 28 U.S.C. § 636(c). On October 23, 1993, following an eleven-day trial, the jury found for Fisher on the Jones Act claim and for Nichols on the unseaworthiness claim. The jury awarded Fisher damages for pain ($65,000), future pain ($155,000), medical expenses ($28,000), and future medical expenses ($75,000) as a result of injuries sustained while Fisher was employed aboard Nichols's yacht. The magistrate judge discounted to present value the award for future pain and entered a judgment accordingly.

On appeal, Nichols argues: (1) that the jury's finding that Fisher was a "seaman" covered by the Jones Act was not a reasonable conclusion from the facts or, alternatively, that as a matter of law, Fisher was not a Jones Act "seaman"; (2) that the jury erred in awarding Fisher $75,000 in future medical costs because proof of such costs was speculative; and (3) that the magistrate judge erred in not discounting to present value the award for future medical costs. On cross-appeal, Fisher argues that the magistrate judge should not have discounted the award for future pain.

The judgment of the district court is affirmed.

## DISCUSSION

### I. Fisher's Status as a Jones Act Seaman

The first question for resolution is whether Fisher is a "seaman" entitled to protection under the Jones Act, which provides as follows:

> Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply .... Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.

46 U.S.C.App. § 688(a). Whether Fisher is a "seaman" is a mixed question of law and fact. *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 356, 111 S.Ct. 807, 818, 112 L.Ed.2d 866 (1991).

Although, as is evident from the language of the statute, the Jones Act covers "seamen" who are "injur[ed] in the course of [their] employment," it does not define these terms. We have no trouble concluding that the district court's finding that Fisher was employed by Nichols aboard the OBSESSION was not clearly erroneous. Fisher's trial testimony, which was credited by the jury, revealed that in exchange for working aboard the OBSESSION, he was paid $250 cash and was reimbursed for travel expenses.

The question whether Fisher is a "seaman" and thus entitled to Jones Act recovery is more difficult. Because the statute does not define this term, the task has been left to the courts. The circuits have, however, set forth inconsistent standards to be applied in determining whether a Jones Act plaintiff is or is not a seaman. *See, e.g., Latsis v. Chandris, Inc.*, 20 F.3d 45, 52–55 (2d Cir. 1994) (requiring employment-related connection to a single vessel or group of vessels and a contribution to the work of the vessel that is substantial in terms of duration and nature), *aff'd*, —— U.S. ——, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995); *Johnson v. John F. Beasley Constr. Co.*, 742 F.2d 1054, 1061 (7th

Cir.1984) (emphasizing the employee's contribution to the transportation function of a vessel), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1180, 84 L.Ed.2d 328 (1985); *Offshore Co. v. Robison,* 266 F.2d 769, 779 (5th Cir.1959) (requiring permanent assignment to a vessel or performance of a substantial part of one's work on the vessel and requiring a contribution to the function of the vessel, the accomplishment of its mission, or to its operation or welfare); *Carumbo v. Cape Cod S.S. Co.,* 123 F.2d 991, 995 (1st Cir.1941) (defining Jones Act "seaman" as "one who does any sort of work aboard a ship in navigation"). Even the Supreme Court has commented that "[o]ur wayward case law has led the lower courts to a myriad of standards and lack of uniformity in administering the elements of seaman status." *McDermott Int'l, Inc. v. Wilander,* 498 U.S. 337, 353, 111 S.Ct. 807, 816, 112 L.Ed.2d 866 (1991) (internal quotation and citation omitted).

■ Two recent Supreme Court cases have, however, attempted to clarify the standard for Jones Act seaman status. *See Chandris, Inc. v. Latsis,* —— U.S. ——, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995); *McDermott,* 498 U.S. 337, 111 S.Ct. 807, 112 L.Ed.2d 866. The rule that emerges has essentially two components. The first component examines the plaintiff's employment at the time of the injury and requires that the "employee's duties ... contribut[e] to the function of the vessel or to the accomplishment of its mission." *Chandris,* —— U.S. at ——, 115 S.Ct. at 2190 (internal quotations omitted). That test is easily met here and requires no further discussion. Fisher was a crewmember actively employed in carrying out functions designed to effectively sail the OBSESSION during a race.

· The second component is concerned with whether the plaintiff derives his livelihood from sea-based activities. *McDermott* laid to rest the idea that in order to qualify for seaman status, one has to aid in the navigation function of a vessel to which he was connected. *McDermott* held that it is not the employee's particular job that is determinative; rather, "[t]he key to seaman status is employment-related connection to a vessel in navigation." 498 U.S. at 355, 111 S.Ct. at

817. However, the Court believed that it was "not called upon [in *McDermott* ] to define this connection in all details." *Id.* Still, it did "hold that a necessary element of the connection is that a seaman perform the work of a vessel." *Id.*

In *Chandris,* the Court addressed the contours of what it meant by "employment-related connection to a vessel in navigation" necessary for a maritime worker to qualify as a seaman under the Jones Act. The *Chandris* Court announced a status-based standard but expressly rejected a "voyage" test which would grant "seaman" status to "anyone working on board a vessel for the duration of a 'voyage' in furtherance of the vessel's mission." —— U.S. at —— ——, 115 S.Ct. at 2184–85. The Court held that "[i]n evaluating the employment-related connection of a maritime worker to a vessel in navigation, courts should not employ a snapshot test for seaman status, inspecting only the situation as it exists at the instant of injury; a more enduring relationship is contemplated." *Id.* at ——, 115 S.Ct. at 2187 (internal quotations omitted). The "seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature." *Id.* at ——, 115 S.Ct. at 2190. The Court explained its reasoning for this requirement as follows:

> The fundamental purpose of this substantial connection requirement is to give full effect to the remedial scheme created by Congress and to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea.

■ Most of the Jones Act cases in which the term "seaman" has undergone scrutiny, such as *Chandris,* have involved land-based employees who are injured while aboard ship and are seeking the protection of the Jones Act. After *Chandris,* if not before, such employees do not qualify for Jones Act coverage. However, Fisher was a sea-based employee. The parties do not dispute that

Fisher was regularly employed (by someone other than Nichols) as a professional yacht captain and that he was a United States Coast Guard licensed captain. The question with respect to Fisher is, therefore, whether his regular sea-based employment, coupled with the work he was performing when the accident occurred, vests him with "seaman" status or whether, as Nichols argues, we are confined in our analysis of Fisher's sea-based employment only to Fisher's connection with Nichols's yacht.

██ Although Fisher's time with the OBSESSION was arguably substantial in nature, it is best characterized as insubstantial in duration—Fisher was aboard the OBSESSION for only one day. However, when we consider Fisher's other paid employment, albeit not for Nichols, we conclude that he satisfies the "substantial connection" test because, as Fisher notes, his "entire career up to and including the moment he suffered the injury was dedicated to sea-based work.... [E]mployment aboard the OBSESSION as a member of its crew was a continuation of [his] chosen profession." We believe that an approach to determining seaman status, which takes into consideration all of one's sea-related activities, not just those pertaining to employment with a particular employer, is fully consistent with the Supreme Court's status-based analysis in *Chandris* and is the approach that most comports with the central purpose of the Jones Act—to protect those who are particularly vulnerable to the perils of the sea as a result of their employment and who, by tradition, have been wards of the admiralty law. *See Aguilar v. Standard Oil Co.*, 318 U.S. 724, 727–28, 63 S.Ct. 930, 932, 87 L.Ed. 1107 (1943) ("From the earliest times, maritime nations have recognized that unique hazards ... attend the work of seamen.... Accordingly, ... maritime nations uniformly have imposed broad responsibilities for [the] health and safety [of seamen] upon the owners of ships.") (footnote omitted). We therefore adopt such an approach and decline to adhere slavishly to the "fleet doctrine" found in the caselaw of some of our sister circuits. *See, e.g., Reeves v. Mobile Dredging & Pumping Co., Inc.*, 26 F.3d 1247, 1256 (3d Cir.1994); *Braniff v. Jackson Ave.–Gretna Ferry, Inc.*, 280 F.2d 523, 528 (5th Cir.1960); *Gizoni v. Southwest Marine, Inc.*, 56 F.3d 1138, 1141 (9th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 381, 133 L.Ed.2d 304 (1995). We do not read *Chandris* as requiring that in order to recover from an employer, a Jones Act plaintiff must necessarily have a substantial connection to a particular vessel owned by that employer or to a group of vessels under common ownership or control of that employer. *But see Grayson v. Petro–Drive, Inc.*, 912 F.Supp. 258, 260 (S.D.Tex.1996) (post-*Chandris* opinion focusing on an employee's connection to a particular vessel or fleet of vessels); *Jones v. United States*, CIV. A. 94–2985, 1996 WL 75583, at *3 (E.D.La. Feb. 15, 1996) (same); *Hardesty v. Rossi*, Civ. No. JFM–94–2320, 1995 WL 688416, at *4 (D.Md. Aug. 15, 1995) (same).

Fisher's regular employment was sea-based and exposed him on a recurring basis to the perils of the sea. When that fact is coupled with his activity aboard the OBSESSION as a crewmember, which contributed to the function of the vessel and the accomplishment of its mission, we believe Fisher is the type of person to whom the Jones Act was designed to give protection.

## II. The Medical Cost Claims

██ Nichols claims that the evidence with which the jury was presented was insufficient to support an award of $75,000 (over 42.6 years) for future medical expenses. In his memorandum order dated April 5, 1994, Magistrate Judge Fox stated: "The evidence permitted the jury to conclude that Plaintiff might incur future medical expenses through the course of his life if the jury accepted evidence supportive of a permanent condition." Nichols claims that Fisher's future medical expenses were too speculative and that the jury's award cannot be upheld. However, Dr. Jones, Fisher's treating orthopedic surgeon, testified that Fisher's condition would probably worsen over time, that Fisher would likely need further medical treatment (including evaluations, x-rays, and physical therapy), and that he would probably have ongoing pain over the course of his lifetime. In addition, Dr. Hanson, Fisher's treating neurosurgeon, testified that Fisher

would have to endure a lifetime filled with recurrent bouts of back spasm and sciatica. Based on this testimony and in light of Fisher's past medical expenses, we do not find the evidence in support of the jury's future medical expense award of $75,000 to be insufficient or the award to be excessive.

■ Both parties appeal Judge Fox's post-trial decisions regarding discounting. Nichols argues that, pursuant to a stipulation entered into by the parties, Judge Fox should have discounted the award for future medical expenses; Fisher cross-appeals, arguing that Judge Fox should not have discounted the award for future pain. We reject both arguments. The parties' stipulation simply reserved the matter of discounting for Judge Fox to consider after the verdict; it did not require any particular result. Fisher's cross-appeal, based on *Oliveri v. Delta S.S. Lines, Inc.*, 849 F.2d 742, 752 (2d Cir. 1988) (suggesting that generally a judge should not discount a jury's award for pain and suffering), similarly lacks merit. This case is distinguishable from *Oliveri* because here the parties stipulated that the magistrate judge would consider discounting any jury award.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.