**Layne B. FOULK and Marjorie E. Foulk, husband and wife, Plaintiffs,**

v.

**DONJON MARINE COMPANY, INC., Defendant and Third–Party Plaintiff,**

v.

**BREAKWATERS INTERNATIONAL INC., Third–Party Defendant.**

**Civil Action No. 95–323(JEI).**

United States District Court, D. New Jersey.

April 9, 1997.

Marvin I. Barrish Law Offices by David B. Winkler, Cherry Hill, NJ, for Layne and Marjorie Foulk.

Wiss, Cooke & Santomauro by Raymond R. Wiss, Thomas K. Bouregy, Jr., Hackensack, NJ, for Donjon Marine Company, Inc.

Murphy & O'Connor by Edward R. Murphy, Haddonfield, NJ, for Breakwaters International, Inc.

IRENAS, District Judge:

Following a commercial diving accident in which plaintiff Layne Foulk became injured, plaintiffs instituted this action sounding in negligence and the general maritime law. The original complaint named as defendants Breakwaters International, Inc. ("Breakwaters") and Donjon Marine Company, Inc. ("Donjon"), respectively, Mr. Foulk's employer and the owner of the barge from which Mr. Foulk was working at the time of the accident. Plaintiffs thereafter amended their complaint to name only Donjon as a defendant. Donjon responded by naming Breakwaters as a third-party defendant and later amended its third-party complaint to add a claim against Breakwaters and in favor of plaintiffs.

The parties now cross-move for partial summary judgment on the issue of Mr. Foulk's seaman status. Because this Court finds that Mr. Foulk is, as a matter of law, not a Jones Act seaman, it will grant Breakwaters' motion for partial summary judgment and deny Donjon's motion for partial summary judgment on the seaman status issue.

## I. BACKGROUND

The Borough of Avalon, New Jersey hired Breakwaters to install an artificial reef off its coast to prevent beach erosion. On May 13, 1993, Breakwaters contracted with Donjon to provide material barges, tugs, a floating crane barge, a barge crew, and a dive crew for the project. On June 30, 1993, since Donjon's divers were non-union and Breakwaters needed to fulfill a union labor project requirement, the parties reversed the original arrangement such that Breakwaters rather than Donjon would supply the commercial dive crew. *See* Creter Dep. at 48–49; Witte Dep. at 62.

Construction began on July 10, 1993 under Breakwaters' direction. Donjon's crane barge, the Farrell 256, was to install the artificial reef from the sea with the help of an underwater dive crew. Mr. Foulk and three

other commercial divers were to assist in the placement of the artificial reef by spotting its location and unhooking pieces of the reef from the crane once they had been placed. For the duration of the project, the dive crew was to sleep ashore and report each morning to the Farrell 256 by motor launch. In addition to its use as a crane barge, the Farrell 256 was to serve as a dive station for the dive crew, holding air compressors, a communications box, and other commercial diving equipment.

On the first day of construction, Breakwaters successfully installed three pieces of the artificial reef according to plan. To connect these to each other and to a pre-existing jetty, the barge crew re-rigged the crane with a "clamshell bucket," filled it with several tons of stone, and lowered it into the water near the jetty. Mr. Foulk swam over to the bucket and began to guide the stone drop when he found himself being pushed through the water towards the jetty. Before he could take evasive action, the clamshell bucket pinned Mr. Foulk against the jetty and severely injured him. Soon after, the Coast Guard arrived and rushed Mr. Foulk to a local hospital where doctors treated him for a crushed right arm, rib fractures, a collapsed lung, and an injured right shoulder.

On January 6, 1995, while on disability, Mr. Foulk and his wife instituted this action against Donjon and Breakwaters sounding in negligence and the general maritime law. On February 14, 1995, plaintiffs amended their complaint to name only Donjon as a defendant. On March 10, 1995, Donjon answered the amended complaint and named Breakwaters as a third-party defendant. Magistrate Judge Joel B. Rosen, by order dated June 1, 1995, amended Donjon's answer and third-party complaint to add a claim against Breakwaters in favor of plaintiffs. The parties now cross-move for partial summary judgment with respect to plaintiff's seaman status.

## II. DISCUSSION

### A. Standard for Summary Judgment

Under Federal Rule of Civil Procedure 56(c), "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A non-moving party may not rest upon mere allegations, general denials, or vague statements in opposition to a summary judgment motion. If the non-moving party's evidence is merely colorable, or is not significantly probative, summary judgment may be granted. See Bixler v. Central Pa. Teamsters Health & Welfare Fund, 12 F.3d 1292 (3d Cir.1993); Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890–91 (3d Cir.1992).

It is not the role of the judge at the summary judgment stage to weigh the evidence or to evaluate its credibility, but to determine "whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The Court must draw all inferences in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, the Court must accept the non-movant's version as true. See Pastore v. Bell Tel. Co., 24 F.3d 508, 512 (3d Cir.1994).

The substantive law governing the dispute will determine which facts are material, and only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510. A genuine issue of material fact for trial does not exist "unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at trial. could be the basis for a jury finding in that party's favor." J.E. Mamiye & Sons, Inc. v. Fidelity Bank, 813 F.2d 610. 618 (3d Cir. 1987) (Becker, J., concurring).

### B. Seaman Status [1]

The Jones Act provides a cause of action in negligence for "any seaman" injured "in the

---

1. Because seaman status is a mixed question of law and fact, see Chandris, Inc. v. Latsis, 515

course of his employment." 46 U.S.C.App. § 688. Prior to the Jones Act, general maritime law only entitled seamen to "maintenance and cure" from their employer for injuries suffered "in the service of the ship," and to recover damages from the vessel's owner for injuries they received "in consequence of the unseaworthiness of the ship." *The Osceola,* 189 U.S. 158, 175, 23 S.Ct. 483, 487, 47 L.Ed. 760 (1903). There was no remedy in negligence against a seaman's employer, *see id.,* consistent with the prevailing conception of the master and servant relationship of the time. *See* W. Page Keeton, *Prosser and Keeton on Torts* § 80, at 569 (5th ed.1984) (discussing the "unholy trinity" of common-law employer defenses to liability—contributory negligence, assumption of the risk, and the fellow-servant rule).

With the passage of the Jones Act, Congress removed this bar to suit and secured for seamen certain legal advantages when injured. As Justice Story explained, seamen "are emphatically the wards of the admiralty" because they "are by the peculiarity of their lives liable to sudden sickness from change of climate, exposure to perils, and exhausting labour." *Harden v. Gordon,* 11 F. Cas. 480, 485, 483 (C.C.Me.1823). And as the Supreme Court later elaborated, these remedies " 'grow[ ] out the status of the seaman and his peculiar relationship to the vessel, and as a feature of the maritime law compensating or offsetting the special hazards and disadvantages to which they who go down to the sea in ships are subjected.' " *McDermott Int'l. Inc. v. Wilander,* 498 U.S. 337, 354, 111 S.Ct. 807, 817, 112 L.Ed.2d 866 (1991) (quoting *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 104, 66 S.Ct. 872, 882, 90 L.Ed. 1099 (1946) (Stone, C.J., dissenting)).

The Jones Act, however, fails to define the term "seaman," leaving unclear exactly which maritime workers are entitled to this special protection. In *Warner v. Goltra,* 293 U.S.

155, 55 S.Ct. 46, 79 L.Ed. 254 (1934), the Supreme Court concluded that Congress intended the term to have its established meaning under the general maritime law of the time. *See id.* at 157–59, 55 S.Ct. at 47 ("[A] seaman is a mariner of any degree, one who lives his life upon the sea."). Similarly, in *Norton v. Warner Co.,* 321 U.S. 565, 64 S.Ct. 747, 88 L.Ed. 931 (1944), the Court suggested that "every one is entitled to the privilege of a seaman who like seamen, at all times contributes to the labors about the operation and welfare of the ship when she is upon a voyage." *Id.* at 572, 64 S.Ct. at 751 (quoting *The Buena Ventura,* 243 F. 797, 799 (S.D.N.Y.1916)).

In 1927, with the passage of the Longshore and Harbor Workers' Compensation Act ("LHWCA"), Congress provided some content to the Jones Act seaman requirement. The LHWCA provides scheduled compensation (and the exclusive remedy) for injury to a broad range of land-based maritime workers but explicitly excludes from its purview "a master or member of a crew of any vessel." 33 U.S.C. § 902(3)(G). As the Jones Act and the LHWCA are mutually exclusive compensation regimes, " 'master or member of a crew' is a refinement of the term seaman in the Jones Act; it excludes from LHWCA coverage those properly covered under the Jones Act." *Wilander,* 498 U.S. at 347, 111 S.Ct. at 813. Injured workers who fall under neither of these categories may still recover under state workers' compensation schemes, *see, e.g.,* N.J.S.A. 34:15–1 to 15–142, or in admiralty under admittedly less generous general maritime tort principles.

■ Two recent Supreme Court cases further clarify this murky legal standard. *See Chandris Inc. v. Latsis,* 515 U.S. 347, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995); *Wilander,* 498 U.S. at 337, 111 S.Ct. at 807–08. The rule that emerges has essentially two

U.S. 347, ——, 115 S.Ct. 2172, 2190, 132 L.Ed.2d 314 (1995), the Court is not bound by assertions in Donjon's third-party complaint—or judicial admissions in Breakwaters' third-party answer-that Mr. Foulk is a Jones Act seaman. *See* 22 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5194, at 197 (1978 & Supp.1996) ("[A] court is not bound by stipulations of mixed fact and

law."); *Fisher v, First Stamford Bank & Trust Co.,* 751 F.2d 519, 523 (1984) (same); *King v. United States,* 641 F.2d 253, 258 (5th Cir.1981) ("A court is not bound by the parties' stipulations of law, particularly when those stipulations are erroneous." (citing *Swift & Co. v. Hocking Valley Ry. Co.,* 243 U.S. 281, 289, 37 S.Ct. 287, 289–90, 61 L.Ed. 722 (1917))).

components. The first of these examines the plaintiff's employment at the time of the injury and requires that the "employee's duties ... contribut[e] to the function of the vessel or to the accomplishment of its mission." *Chandris,* 515 U.S. at ——, 115 S.Ct. at 2190 (internal quotations omitted); *see also Wilander,* 498 U.S. at 353–55, 111 S.Ct. at 816–18 (requiring that a seaman "do[ ] the ship's work"). This requirement is easily met here. Mr. Foulk and the dive crew were engaged to aid the Farrell 256 in its mission of installing the artificial reef. Indeed, their help was necessary to position pieces of the artificial reef properly. *See Wilander,* 498 U.S. at 355, 111 S.Ct. at 817–18 (no longer requiring that a seaman aid in a vessel's navigation per se); *cf. Wallace v. Oceaneering Int'l,* 727 F.2d 427, 431 (5th Cir.1984) (involving divers assisting in a vessel's oil-well drilling mission by placing drilling templates on the ocean floor).

■ The second component of seaman status evaluates the worker's "connection to a vessel in navigation (or an identifiable group of vessels)" and requires that it be "substantial in terms of both its duration and its nature." *Chandris,* 515 U.S. at ——, 115 S.Ct. at 2190. The purpose of this requirement is to "separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation," thus reserving special seaman status for those whose employment regularly exposes them to the perils of a ship at sea. *Id.* Accordingly, " 'the total circumstances of an individual's employment must be weighed to determine whether he had a sufficient relation to the navigation of vessels and the perils attendant thereon.' " *Id.* (quoting *Wallace,* 727 F.2d at 432).

■ Two judicial doctrines somewhat ease the demands of this connection requirement. The first is the fleet seaman doctrine, adopted by the Third Circuit in *Reeves v. Mobile Dredging & Pumping Co.,* 26 F.3d 1247, 1256 (3d Cir.1994). Under the fleet seaman doctrine, a maritime worker's connection to a vessel in navigation may be to a particular vessel, or to several specific vessels under common control or ownership. *See id.* at 1253–56. The second remedial doctrine is the "no snapshot" doctrine, articulated in *Chandris* and other cases. *See, e.g., Chandris,* 515 U.S. at ——, —— – ——, 115 S.Ct. at 2187, 2191–92; *Wallace,* 727 F.2d at 432–33. Under this doctrine, courts evaluate not a worker's connection to a vessel or fleet as of the moment of injury, but rather his intended relationship as if he had completed his mission, tour, or voyage uninjured. *See, e.g., Chandris,* 515 U.S. at ——, —— – ——, 115 S.Ct. at 2187, 2191–92 (rejecting a " 'snapshot' test for seaman status"); *Wallace,* 727 F.2d at 432–33. Thus, under the "no snapshot" doctrine, a worker who would otherwise qualify as a Jones Act seaman would not lose his status if injured in the first few moments of his employment.

■ The fleet seaman doctrine fails to help Mr. Foulk's case for seaman status. As a freelance diver, Mr. Foulk made his career diving for many different employers, one of which was Breakwaters. See Foulk Aff. ¶ 3.[2] However, the many vessels from which Mr. Foulk worked were not under common control or ownership; rather they comprise a random assortment of tug boats, pilot boats, and barges with little in common other than their brief connections with Mr. Foulk. *See id.* ¶ 5.[3] Accordingly, the Court will only look to Mr. Foulk's brief employment relationship with Donjon-namely, the Avalon reef project-in determining the whether his connection to

---

**2.** Prior to the Avalon reef project, Mr. Foulk had worked for Breakwaters twice: once to install an artificial reef, and once to dismantle one. *See* Foulk Dep. at 75. One of these jobs involved a helicopter instead of a crane barge. *See id.* at 80.

**3.** Indeed, even ignoring the fleet seaman doctrine, the random assortment of vessels (and non-

vessels) from which Mr. Foulk has worked throughout his career cannot constitute an "identifiable group of vessels" within the meaning of *Chandris*: he has not attempted to identify them, and some of them are not even vessels. *See supra* note 2 (noting Mr. Foulk's prior dive from a helicopter).

a vessel in navigation was sufficiently substantial.[4]

The "no snapshot" doctrine helps Mr. Foulk's case for seaman's status to some extent. At the time of his injury, Mr. Foulk had worked aboard and alongside the Farrell 256 for only half a day. However, but for his injury, Mr. Foulk would have spent about ten days working on the Avalon reef project. *See* Foulk Aff. ¶ 6. Accordingly, following the "no snapshot" doctrine, the Court will consider the duration of his connection to the Farrell 256 not four hours but rather the ten days the Avalon reef project was expected to last.

Turning to the substantive elements of *Chandris*'s connection component, the Court must consider the nature of Mr. Foulk's connection to the Farrell 256 sufficiently substantial. Not only was Mr. Foulk diving from the Farrell 256, he was physically connected to it via a diver's "umbilical cord" containing vital air and communications lines. *See* Foulk Aff. ¶ 7, 8. As stated above, Mr. Foulk and the dive crew were necessary for the successful completion of the Farrell 256's mission-the construction of the artificial reef. Moreover, courts have long considered commercial divers who work from vessels eligible for seaman status:

A diver's work necessarily involves exposure to numerous marine perils, and is inherently maritime because it cannot be done on land.... [W]hen a diver descends from the surface, bracing the darkness, temperature, lack of oxygen, and high pressures, he embarks on a marine voyage in which his body is now the vessel. Before he can complete his assigned task, he must successfully navigate the seas.... It is the inherently maritime nature of the tasks performed and perils faced by his profession ... that makes [a commercial diver] a seaman.

*Wallace,* 727 F.2d at 436. Thus, in all respects, Mr. Foulk's connection to a vessel in navigation was sufficiently substantial in nature.

However, *Chandris* also imposes a durational requirement, namely, that a maritime worker's connection to a vessel be "substantial" in duration. *Chandris,* 515 U.S. at ——, 115 S.Ct. at 2190. As the Supreme Court explains, "connection to a vessel that is substantial in terms of its duration" is simply a different way of requiring a "more or less permanent assignment" to a vessel. *See id.* And as the Second Circuit noted, the "more or less permanent" formulation "has not been read strictly but mean[s] that the connection must be more than 'temporary or transitory.'" *Latsis v. Chandris,* 20 F.3d 45, 53 (2d Cir.1994), *aff'd,* 515 U.S. 347, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995). These formulations the Supreme Court considered "simply different ways of getting at the same basic point: the Jones Act remedy is reserved for sea-based maritime employees whose work regularly exposes them to 'the special hazards and disadvantages to which they who go

4. Mr. Foulk and Donjon assert that, the fleet seaman doctrine notwithstanding, this Court should consider Mr. Foulk's entire diving career in assessing whether his connection to a vessel in navigation is sufficiently substantial For support, they argue that *Chandris's* "total circumstances" language precludes such a narrow view of one's status. While there is authority supporting this position, *see, e.g., Fisher v. Nichols,* 81 F.3d 319, 323 (2d Cir.1996); *Papai v. Harbor Tug & Barge Co.,* 67 F.3d 203, 206 (9th Cir.1995), there is no Third Circuit authority supporting this position. *See Fisher,* 81 F.3d at 323 (noting its disagreement with the Third Circuit). Moreover, *Chandris's* reference to an "identifiable group of vessels," *Chandris,* 515 U.S. at ——, 115 S.Ct. at 2190, seems to embrace the fleet seaman doctrine. *See Papai,* 67 F.3d at 209 (Poole, J., dissenting) (reading *Chandris's* as consistent with the fleet seaman doctrine); *Grayson v. Petro-Drive, Inc.,* 912 F.Supp. 258, 260 (S.D.Tex.1996)

(same); *Jones v. United States,* No. 94–2985, 1996 WL 75583, at *3 (E.D.La. Feb.15, 1996) (same); *Hardesty v. Rossi,* No. 94–2320, 1995 WL 688416, at *4 (D.Md. Aug. 15, 1995) (same); Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 6.9, at 18 n. 91 (2d ed. Supp.1997) ("In *Chandris,* the Supreme Court seems to have approved the 'fleet seaman doctrine' under which a worker who works on several vessels is a seaman only if he works on a fleet of vessels under common control."). In addition, on its facts *Chandris* fully comports with the fleet seaman doctrine. *See Chandris,* 515 U.S. at —— ——, 115 S.Ct. at 2181–82 (describing Mr. Latsis's duties on the Chandris fleet of ships). Accordingly, this Court reads *Chandris* to be perfectly consistent with the fleet seaman doctrine and will apply the doctrine to look only at Mr. Foulk's connection to a vessel during the Avalon reef project.

down to the sea in ships are subjected.'" *Chandris*, 515 U.S. at ——, 115 S.Ct. at 2190 (quoting *Sieracki*, 328 U.S. at 104, 66 S.Ct. at 882 (Stone, C.J., dissenting)).

In *Chandris*, the plaintiff. Antonios Latsis, was a supervisory engineer for the the Chandris fleet responsible for maintaining and updating its electronic and communications equipment. *See Chandris*, 515 U.S. at ——, 115 S.Ct. at 2181. In addition to planning and directing ship maintenance from his Miami office, Mr. Latsis would regularly take voyages on Chandris's ships to oversee vessel engineers aboard ship. Chandris hired Mr. Latsis as a salaried superintendent engineer for an indefinite term, not on a temporary basis.[5] On one of Mr. Latsis's very first voyages, a ship's doctor diagnosed him as having a suspected detached retina but failed to follow standard medical procedures accordingly. *See id.* at ——, 115 S.Ct. at 2181.

In *Wallace*, the plaintiff, Jerome Wallace, was a commercial construction diver like Mr. Foulk. Unlike Mr. Foulk, however, Mr. Wallace did not freelance. Instead, Mr. Wallace took permanent employment with a diving service contractor, Oceaneering, and sought to be permanently assigned to the company's vessel, the Oceaneer I, when it returned from the Gulf of Mexico. *See Wallace*, 727 F.2d at 430. He wished to make the Oceaneer I his home, "eating and sleeping aboard" it "for months at a time," as he had done in previous employment. *Id.* Oceaneering promised to assign Mr. Wallace to the Oceaneer I when it returned to port, and in the meantime assigned him to another vessel, the Intrepid. *See id.* Unfortunately, Mr. Wallace fell victim to a construction accident while on the Intrepid and never came to join the Oceaneer I as originally anticipated. *See id.* at 431.

Measured against *Chandris* and *Wallace*, Mr. Foulk's relationship with the Farrell 256, Donjon, and Breakwaters was most impermanent. A freelance diver, Mr. Foulk accepted a temporary ten-day assignment for Breakwaters on Donjon's crane barge installing an artificial reef. *See* Foulk Aff. ¶¶ 3, 6.

After the ten days, Mr. Foulk would not continue working for Donjon or for Breakwaters but rather he would look for other freelance diving jobs. He did not sleep or eat or live aboard the Farrell 256 but rather stayed ashore in a condominium reporting to work by ferry each morning. *See id.* ¶ 6. Ten days (excluding nights), with no view towards a more permanent relationship, is simply too short a duration to satisfy the *Chandris* durational requirement for seaman status. Accordingly, as a matter of law, this Court finds that plaintiff Layne Foulk does not qualify as a seaman within the meaning of the Jones Act, *Chandris*, and federal admiralty law. As a result, he cannot recover in negligence under the Jones Act, or for unseaworthiness or maintenance and cure under the general maritime law.

### III. CONCLUSION

Because as a matter of law Mr. Foulk does not qualify as a Jones Act seaman, this Court will grant Breakwaters' motion for partial summary judgment and deny Donjon's motion for partial summary judgment on the seaman status issue. An appropriate order will issue on even date herewith.

---

**5.** Mr. Latsis worked for Chandris for over approximately one and one-half years, from May, 1989 to November, 1990, when his employment

was terminated. *See Chandris*, 515 U.S. at ——, 115 S.Ct. at 2181.